HUNTER, JR. Robert N., Judge.
 

 *743
 
 James Nathaniel Ricks, Jr. ("Defendant") appeals from a jury verdict convicting him of common law robbery, and obtaining property by false pretenses. Defendant pled guilty to obtaining habitual felon status. Defendant contends the trial court erred by instructing the jury on the lesser included offense of common law robbery. Defendant also contends the indictment charging him with obtaining property by false pretenses is fatally defective. We find no error.
 

 I. Factual and Procedural History
 

 On 3 January 2012, Defendant was indicted for robbery with a dangerous weapon. On 26 March 2012, a grand jury indicted Defendant for obtaining property by false
 
 *639
 
 pretenses. On 24 September 2012, the grand jury issued a superseding indictment for habitual felon status against Defendant.
 

 Defendant's jury trial began on 11 February 2013. Judge James E. Hardin, Jr. presided over Defendant's trial in Alamance County Superior Court. The State's evidence, in part, tended to show the following.
 

 The State called Martin Hugo Bermudez Amaya ("Amaya") to testify. Amaya along with his wife and children live at the Family Car Wash. Amaya was at the business on 6 October 2011, around lunch time when Defendant's car, a gold, four-door Cadillac, parked on the premises and Defendant emerged. Amaya described his interaction with Defendant:
 

 He say he got a 50 inch TV and he want to sell it. And in that moment I don't even have a TV in my place. That's the reason I say, I want to see that TV ... Because I don't have a TV in that moment for my kids ... Well, he say about $400. I say I don't have the $400. I just got $100.
 

 *744
 
 After Amaya told Defendant he only had $100, and after a phone call, Defendant asked Amaya when he could get the rest of the money. Amaya told Defendant he got paid every Friday. Defendant made a second phone call and told Amaya "his buddy told him that would be okay."
 

 Next, Amaya got in the front passenger seat of Defendant's car. Defendant told Amaya they were going to Defendant's house to retrieve the TV. Amaya asked Defendant:
 

 [C]an I take another person with me in the back of his car. He say, no, you and me and my buddy can put it in the car. And I say that-I mean, that TV don't want to fit in your car because he told me it was a 50 inch TV. And he said he got a truck to put it in.
 

 While traveling to get the television, Amaya and Defendant engaged in small talk. Amaya was not scared at that point. Then, Amaya explained another person entered Defendant's car. Next, Amaya described what happened to him:
 

 [Defendant] told me that-you see that truck right there and I said, yes. And he, that's where I got the TV. And then I start-I don't feel in that moment comfortable because he was telling me he got a TV in his house and I know that business because I do electrical job and I know those guys right there and that business and as I told him, you lied to me. As soon as I say that, you lied to me, he just do like what, what do you say. And then when I say those words I feel like something is pulling on this side of my body [left side] and that man just told me, give me what you got. The guy that was behind me [said give me what you got]. I just look like this and I-I like-I mean, I look at him and I say, you know how much I got and I just got the money and I throw it on [Defendant's] leg.
 

 Amaya described what he saw and believed to be a gun:
 

 Well, when I do like this I saw the gun ... It was like a gun, black colored gun ... Actually, I don't see how big it was but I see the gun when he point it to me in this part ... it was dark. Like a black color ... It was-I mean, when I see I look like it was a gun to me ... All I know is I saw the gun. I mean, I don't have chance to say, yeah, that's real or fake ... Well, I was scared. I was scared and I kind nervous ...
 

 *745
 
 After Amaya threw the money on Defendant's leg, Amaya was told to get out of Defendant's car. Defendant and the other person drove off. As the car drove away, Amaya took a pen from his pocket and wrote down the license plate number.
 

 Then, Amaya walked to City Electric and used their telephone to call his wife. Amaya told his wife what happened. Amaya's wife picked him up and drove him back to the car wash.
 

 Once Amaya returned to the car wash, Herman Elliott ("Elliott") came and spoke to him. Elliott had a lawn mower repair shop next to Amaya's car wash business and shared a parking lot with Amaya. Amaya explained to Elliott what happened. Elliott called the police. Shortly after, Corporal Joey Surles ("Officer Surles") and Officer Gary Scott Elliott ("Officer Elliott") arrived
 
 *640
 
 at Amaya's business. Later that day, at a show-up, Amaya described who he saw.
 

 [Defendant] was standing up out of his car talking to officer and then I was-I was in the back of the officer car and he told me if I saw someone to I know, he told me, like, if that's the man to do-stole your money and I say, yes, sir, he is ... The officer asked me if I know that man. I said, yes, that's the man that stole me ... Well, I say, yes, 100% sure he is.
 

 The State called a number of officers to testify. Officer Surles testified first. On 6 October 2011, Officer Surles was employed by the Burlington Police Department as an officer and working in that capacity when he and Officer Elliott responded to a robbery call. Amaya gave Officer Surles a statement regarding what happened. Officer Surles recounted his interview with Amaya during his testimony.
 

 When he got [to the intersection of Church and O'Neal in front of City Electricity Supply]-[the second black male] got into the vehicle he said he sat directly behind him and as they turned right on to O'Neal the second suspect produced a firearm and pointed it at his lower left side ... it was a black handgun. He was not sure if it was a revolver, whether it was a revolver or semi-automatic or what brand or make or anything like that.
 

 Then, Officer Surles explained to Amaya that a show-up would take place and that the person who robbed him may or may not be the one at the police department. After Amaya positively identified Defendant as the person who robbed him, Defendant was read his rights and placed under
 
 *746
 
 arrest. Defendant waived his rights and agreed to be interviewed by the police officers. Officer Elliott primarily interviewed Defendant, Officer Surles sat in. Officer Surles described the interview with Defendant.
 

 Mr. Ricks [Defendant] stated that he went to 1412 East Webb Avenue to get his car washed. He stated that Mr. Martin [Amaya] asked if he had a TV to sell and Mr. Ricks told him, yes, he had one and for $90. Ricks stated that Martin wanted to see the TV or Mr. Amaya wanted to see the TV before he bought it and so he took him to look at the TV. He stated that he didn't want to take Martin to his house so he took him to the Aldi foods and he said he took the $90 and told him that he would be right back ... After that conversation Mr. Ricks advised that he did try to scam Mr. Amaya by telling him that he had something to sell but really did not. [Defendant] advised [Officer Elliott] that [Defendant] was actually not planning to return the money ... [Defendant] continuously stated that there was no robbery and no gun.
 

 Next, the State called Officer Elliott to testify. Officer Elliott, a patrol officer for the Burlington Police Department, assisted Officer Surles with the robbery call. Amaya gave Officer Elliott the license plate number which was run through the search system. The search revealed that the license plate number was registered to a gold, Cadillac four door, sedan Deville. Officer Elliott further concluded that the vehicle associated with that license plate number belonged to Defendant. Officer Elliott contacted Defendant and arranged for Defendant to come by the police department.
 

 Then, Officer Elliott described his initial interactions with Defendant.
 

 [Defendant] started recanting his story about that he gave a Hispanic male a ride to go buy a TV. However, the sale was not completed ... [Defendant] reached into his left pocket and said here's the money, if I give him the money, can I go home ... I confirmed this is the money that, in fact, the victim gave you and you kept it until now and he said, yes ...
 

 Next, Officer Elliott explained what happened at the show-up and Defendant's subsequent interview:
 

 Mr. Ricks was instructed just to stand near me. He was not in any type of restraints ... We both stood there and
 
 *747
 
 Officer Surles notified me that it was 100 percent identification. Based on the results of the show-up and the fact that he had the victim's money in his pocket, he was subsequently arrested.
 

 [Officer Elliott] confirmed again with [Defendant] that he did intentionally-unlawfully
 
 *641
 
 and intentionally take the $100 from the victim. [Defendant] said, yes ... He confessed to planning to deprive the victim of money, taking the money from the victim ... I probably said, did he intentionally willing to deprive someone of money. He said yes.
 

 The State of North Carolina rested following testimonies by other witness. The Defense made a motion to dismiss both charges at the close of State's evidence. The ground for Defense's motion was based on insufficiency of the evidence. In the court's discretion, the motion was denied.
 

 The Defense's evidence, in part, tended to show the following. James Ricks, Jr. ("Defendant") testified on his own behalf. Defendant described the incident of 6 October 2011:
 

 On October the 6th, when I went [to the Family Car Wash] I told him [Amaya], I said, I needed my car washed. He asked me did I have a TV for sale. I said, I got one at home, it don't work that good. He said, no, he just wanted to play videos on it with his kids. So I said, okay. I said, let's go get it. He jumps right in the car, just like he said, and we drove and got it. So on the way there I said, well, my wife is sick. I don't want to worry her to death ... And on the way there I said, well, I'm going to stop here and run and get the TV. He said that would be good. I'll get some tater chips and a grape soda for the kids to play videos and I went on home ... I went to the telephone ... So I answered the telephone ... Burlington police. He said this is Officer Elliott. I need you to come down so that I can show you a line-up.
 

 Defendant explained his interactions with the police officers:
 

 I said, what you mean, sitting in the back seat of my car. He said, well, a guy been robbed at gun point out of $100. I said, man, nobody been robbed ... I say I don't know nothing about that and that's all I said. I don't know nothing about that. I don't know nothing about nobody being robbed.
 

 *748
 
 Defendant denied anyone else being in the car. Defendant denied a gun being in his car. The Defense rested after Defendant's testimony. The State did not present a rebuttal argument. At the close of all the evidence, Defense renewed its motion to dismiss the armed robbery charge and also the obtaining property by false pretenses charge based on insufficiency of the evidence. The motion was denied.
 

 At the charge conference, the trial court said it would instruct on the lesser included offense of common law robbery. The State responded to a jury instruction that included common law robbery.
 

 Well, he says it didn't happen at all. So the evidence is an armed robbery. The victim testified a gun was presented to him and he threw the money down. [Defendant] says that didn't happen at all. So I would say that there is not common law robbery. But whatever Your Honor thinks best.
 

 Defense counsel objected to a jury instruction pattern that gave instruction on the lesser included offenses of armed robbery with a dangerous weapon. Defense counsel stated "[a]gain, I'm not asking for any lesser included. I think it's either armed robbery or it's not." The trial court decided to instruct on all the lesser included offenses of robbery with a dangerous weapon.
 

 The jury found Defendant guilty of common law robbery and obtaining property by false pretenses. Defendant pled guilty to habitual felon status. The convictions were consolidated. On 14 February 2013, the trial court sentenced Defendant, as a Level III offender, to a prison term of ninety-six to one-hundred and twenty-five months. On 26 June 2014, this Court granted Defendant's Petition for Writ of Certiorari for the purpose of reviewing the 14 February 2013 judgment.
 

 II. Jurisdiction
 

 Jurisdiction lies in this Court pursuant to N.C. Gen.Stat. § 7A-27(b) (2013), which provides for an appeal of right to the Court of Appeals for any final judgment of a superior court.
 

 III. Standard of Review
 

 We review the issues on appeal under two different standards of review. "As to the
 
 *642
 
 issue of jury instructions, we note that choice of instructions is a matter within the trial court's discretion and will not be overturned absent a showing of abuse of discretion."
 
 State v. Nicholson,
 

 355 N.C. 1
 
 , 66,
 
 558 S.E.2d 109
 
 , 152,
 
 cert. denied,
 

 537 U.S. 845
 
 ,
 
 123 S.Ct. 178
 
 ,
 
 154 L.Ed.2d 71
 
 (2002). "An instruction on a lesser-included offense must
 
 *749
 
 be given only if the evidence would permit the jury rationally to find defendant guilty of the lesser offense and to acquit him of the greater."
 
 State v. Millsaps,
 

 356 N.C. 556
 
 , 561,
 
 572 S.E.2d 767
 
 , 771 (2002). Further, "[an] error in jury instructions is prejudicial and requires a new trial only if 'there is a reasonable possibility that, had the error in question not been committed, a different result would have been reached at the trial out of which the appeal arises.' "
 
 State v. Castaneda,
 

 196 N.C.App. 109
 
 , 116,
 
 674 S.E.2d 707
 
 , 712 (2009) (quoting N.C. Gen.Stat. § 15A-1443 (a) (2007) ).
 

 This Court reviews the sufficiency of an indictment
 
 de novo.
 

 State v. McKoy,
 

 196 N.C.App. 650
 
 , 652,
 
 675 S.E.2d 406
 
 , 409,
 
 disc. rev. denied,
 
 appeal dismissed,
 
 363 N.C. 586
 
 ,
 
 683 S.E.2d 215
 
 (2009). "An attack on an indictment is waived when its validity is not challenged in the trial court."
 
 State v. Wallace,
 

 351 N.C. 481
 
 , 503,
 
 528 S.E.2d 326
 
 , 341,
 
 cert. denied,
 

 531 U.S. 1018
 
 ,
 
 121 S.Ct. 581
 
 ,
 
 148 L.Ed.2d 498
 
 (2000). "However, where an indictment is alleged to be invalid on its face, thereby depriving the trial court of its jurisdiction, a challenge to that indictment may be made at any time, even if it was not contested in the trial court."
 

 Id.,
 

 528 S.E.2d at 341
 
 .
 

 IV. Analysis
 

 A. Jury Instruction
 

 "An instruction on a lesser-included offense must be given only if the evidence would permit the jury rationally to find defendant guilty of the lesser offense and to acquit him of the greater."
 
 State v. Millsaps,
 

 356 N.C. 556
 
 , 561,
 
 572 S.E.2d 767
 
 , 771 (2002). However, "where the State's evidence is positive as to each element of the offense charged and there is no contradictory evidence relating to any element, no instruction on a lesser included offense is required."
 
 Id.
 
 at 562,
 
 572 S.E.2d at 772
 
 . The necessity for instructing the jury as to a lesser included crime arises only when there is evidence from which the jury could find that the included crime of lesser degree was committed.
 
 State v. Tarrant,
 

 70 N.C.App. 449
 
 , 451,
 
 320 S.E.2d 291
 
 , 294 (1984).
 

 "Common law robbery is a lesser included offense of armed robbery or robbery with a firearm or other dangerous weapon and an indictment for armed robbery will support a conviction of common law robbery."
 
 Id.
 
 at 451,
 
 320 S.E.2d at 293-94
 
 (1984). The primary distinction between armed robbery and common law robbery is that "the former is accomplished by the use or threatened use of a dangerous weapon whereby the life of a person is endangered or threatened."
 
 State v. Frazier,
 

 150 N.C.App. 416
 
 , 418,
 
 562 S.E.2d 910
 
 , 912-13 (2002). In deciding whether a particular instrument is a dangerous weapon, "the determinative question is whether the evidence was sufficient to support a jury finding that
 
 *750
 
 a person's life was in fact endangered or threatened."
 
 Id.
 
 at 419,
 
 562 S.E.2d at 913
 
 .
 

 On appeal, Defendant contends the instruction on common law robbery was not supported by the evidence. Defendant further contends that the trial court erred in including common law robbery when defense counsel asked the court for no instruction on any lesser included offense. We are not persuaded.
 

 Choice of jury instruction is within the trial court's discretion when there is some evidence of the lesser offense. At trial, the State's evidence, in part, tended to show through Amaya's testimony, that a gun was used. Amaya stated that he saw a black gun when he was told to give the $100. Amaya further testified that he did not know whether or not the gun was real or plastic but that he saw the gun. Amaya also stated that he was scared and "kind nervous." Amaya told multiple people after the incident that a gun was pointed at him.
 

 Some evidence was presented that would allow a jury to conclude on a lesser offense of common law robbery. During Defendant's testimony, Defendant denied that he had picked anyone up for a ride at the time of the
 
 *643
 
 incident. Defendant also denied that a gun had been used.
 

 Armed robbery requires the crucial element of a dangerous weapon whereas common-law robbery does not. The victim, Amaya, testified that a he saw a black gun when he was demanded to give the money. The officers testified Defendant denied that a robbery had occurred, or that a gun was ever used. Defendant, in his testimony, denied that there was ever a gun, or a dangerous weapon. Therefore, the contradictory evidence as to one of the elements of armed robbery was enough to permit the jury to rationally find Defendant guilty of the lesser included offense of common law robbery.
 

 For the foregoing reasons, there is no showing that the trial court abused its discretion in instructing on the lesser included offense. Instruction on the lesser included offense of common law robbery was proper and within the trial court's discretion. Therefore, we find no error in the jury instructions.
 

 B. Indictment Sufficient
 

 An indictment must charge the "essential elements of the offense."
 
 State v. Snyder,
 

 343 N.C. 61
 
 , 65,
 
 468 S.E.2d 221
 
 , 224 (1996) (citation omitted). "[T]he evidence in a criminal case must correspond with the allegations of the indictment which are essential and material to charge
 
 *751
 
 the offense."
 
 State v. Walston,
 

 140 N.C.App. 327
 
 , 334,
 
 536 S.E.2d 630
 
 , 635 (2000). The purpose of an indictment is to give defendant reasonable notice of the charges against him so that he may prepare for his upcoming trial.
 
 State v. Campbell,
 

 368 N.C. 83
 
 , ----,
 
 772 S.E.2d 440
 
 , 443 (2015) (citing
 
 State v. Sturdivant,
 

 304 N.C. 293
 
 , 308,
 
 283 S.E.2d 719
 
 , 729 (1981) ).
 

 The elements of obtaining property by false pretenses are "(1) a false representation of a subsisting fact or a future fulfillment or event, (2) which is calculated and intended to deceive, (3) which does in fact deceive, and (4) by which one person obtains or attempts to obtain value from another."
 
 State v. Ledwell,
 

 171 N.C.App. 314
 
 , 317,
 
 614 S.E.2d 562
 
 , 565 (2005).
 

 In this case, the indictment states:
 

 ... the defendant named above unlawfully, willfully and feloniously did knowingly and designedly with the intent to cheat and defraud obtain and attempt to obtain a quantity of U.S. currency from [Amaya].... The Defendant representing that he had a television to sell for a quantity of U.S. Currency, when in fact the Defendant did not have a television to sell for a quantity of U.S. Currency and never intended to have a television to sell for a quantity of U.S. Currency.
 

 Defendant challenges the indictment for obtaining property by false pretenses based on the use of "U.S. Currency" instead of a more specific description of the property. The indictment provided no description of the number or denomination of the bills and also did not specify the amount of money at issue. Citing
 
 Smith
 
 and
 
 Reese,
 
 Defendant says that the indictment must contain the amount of money at issue. Based on what Defendant contends is a flawed indictment, Defendant asks this Court to reverse his conviction for obtaining property by false pretenses for lack of jurisdiction. We are not persuaded.
 

 We look to a line of North Carolina Supreme Court cases beginning in 1880 to respond to Defendant's arguments. First,
 
 State v. Reese
 
 involved a bill of indictment charging defendant with obtaining goods and money by false pretenses.
 
 83 N.C. 637
 
 , 638,
 
 1880 WL 3420
 
 , *1 (1880). The indictment described the fraudulently obtained property as "goods and money ... to the value of fifty dollars."
 

 Id.,
 

 1880 WL 3420
 
 at *1. The Supreme Court decided the bill was too vague, saying "the money obtained should have been described at least by the amount, as for instance so many dollars and cents."
 

 Id.,
 

 1880 WL 3420
 
 at *1.
 

 *752
 
 However, the opinion goes on to explain the indictment in that case was issued before 1877, when the legislature enacted a new statute to address bills of indictment in larceny cases.
 

 Id.,
 

 1880 WL 3420
 
 at *1. Generally, the same degree of certainty must be used to describe the goods in indictments for obtaining property by false pretenses as in indictments for larceny.
 

 *644
 

 Id.
 
 at 639,
 
 1880 WL 3420
 
 at *1. The new statute, cited as the act of 1876-77, ch.68 stated:
 

 That in every indictment in which it shall be necessary to make any averment as to the larceny of any money, or United States treasury note, or any note of any bank whatsoever, it shall be sufficient to describe such money, or treasury note, or bank note, simply as money, without specifying any particular coin, or treasury note, or bank note; and such allegation, so far as regards the description of the property, shall be sustained by proof of any amount of coin or treasury note, or bank note, although the particular species of coin, of which such amount was composed, or the particular nature of the treasury note, or bank note, shall be proven.
 

 N.C. Sess. Laws 1876-77 Ch.68. That act is still in effect today.
 
 N.C. Gen. Stat. § 15149
 
 (2013).
 

 Following the adoption of the act of 1876-77,
 
 Freeman
 
 interpreted the statute as it relates to the denomination of the money taken. In
 
 State v. Freeman,
 
 the defendant was charged with larceny of a purse, a key, and "thirty dollars in money."
 
 89 N.C. 469
 
 , 470,
 
 1883 WL 2553
 
 , *1 (1883). Defendant contended there was a fatal variance in the bill of indictment because the indictment said "thirty dollars" instead of describing the exact currency stolen as three ten dollar bills. Referencing the act of 1876-77, codified at that time as § 1190, our Supreme Court responded, "All that is necessary in a bill of indictment for the larceny of money or United States treasury notes, or any note of any bank whatever, is to describe it as
 
 money
 
 ..."
 
 Id.
 
 at 471-472,
 
 1883 WL 2553
 
 at *2 (emphasis in original.). The Court went on to explain indictments "shall be sustained by proof of
 
 any amount
 
 of coin or treasury note...."
 
 Id.
 
 at 472,
 
 1883 WL 2553
 
 at *2 (emphasis added).
 

 The principle that the item obtained in a false pretense crime and the thing stolen in larceny must be described with the same degree of certainty was reaffirmed in 1915.
 
 State v. Gibson,
 

 169 N.C. 318
 
 ,
 
 85 S.E. 7
 
 , 8 (1915). The item must be described with "reasonable certainty" and "by the name or term usually employed to describe it."
 

 Id.,
 

 85 S.E. at 8
 
 .
 

 *753
 

 Gibson
 
 involved an indictment describing the falsely obtained property as " money" when, in fact, it was a promissory note.
 

 Id.,
 

 85 S.E. at 8-9
 
 . The Court held the trial court should have dismissed the indictment because it did not accurately describe the thing obtained.
 

 Id.,
 

 85 S.E. at 9
 
 .
 

 In 1941, our Supreme Court again considered an indictment in a false pretenses case, this time the defendant was charged with obtaining "goods and things of value."
 
 State v. Smith,
 

 219 N.C. 400
 
 , 400,
 
 14 S.E.2d 36
 
 , 36 (1941). Evidence tended to show defendant fraudulently obtained $150.
 

 Id.,
 

 14 S.E.2d at 37
 
 . The Court explained "goods and things" was too vague and uncertain a description of the property obtained to be sufficient. Quoting
 
 Reese,
 
 the Court said the money "should have been described at least by the amount, as, for instance, so many dollars and cents." The Court also cited to
 
 Gibson
 
 for the same proposition, but that case involved whether describing a promissory note as "money" was proper, not whether money had to be described in dollars and cents.
 

 The Court failed to look to the statute when deciding
 
 Smith.
 
 The Court quoted
 
 Reese,
 
 but failed to follow
 
 Reese
 
 as a whole by not considering the statute governing the description of money in indictments. This faulty citation to
 
 Reese,
 
 quoting one sentence no longer applicable due to the new statute, led our Court to the incorrect conclusion again in
 
 Jones.
 

 The Supreme Court's most recent decision on point is
 
 State v. Jones
 
 ,
 
 367 N.C. 299
 
 ,
 
 758 S.E.2d 345
 
 (2014). The indictment charged that Jones obtained "services" by false pretenses.
 
 Id.
 
 at 307,
 
 758 S.E.2d at 351
 
 . The Court mentioned
 
 Reese
 
 and
 
 Smith,
 
 saying that "money" is insufficient to describe the property without going into further detail.
 

 Id.,
 

 758 S.E.2d at 351
 
 . The decision rested on the term "services" and not any description of money, thus the mention of the previous holdings was merely dicta and not necessary for the holding in that case. Even so, the statement rested on the faulty precedent of
 
 Smith
 
 which did not rely on N.C. Gen.Stat. § 15-149.
 

 *645
 
 In our decision we cannot ignore a statute directly on point. As codified today, the statute originally passed in 1877 states:
 

 In every indictment in which it is necessary to make any averment as to the larceny of any money, or United States treasury note, or any note of any bank whatsoever,
 
 it is sufficient to describe such money, or treasury note, or bank note, simply as money,
 
 without specifying any
 
 *754
 
 particular coin, or treasury note, or bank note; and such allegation, so far as regards the description of the bank note, although the particular species of coin, of which such amount was composed, or the particular nature of the treasury note, or bank note, shall not be proven.
 

 N.C. Gen.Stat. § 15-149 (2013) (emphasis added). And, while we understand the statute says it applies to larceny, indictments for larceny and obtaining property by false pretenses are required to have the same degree of certainty.
 
 Reese,
 

 83 N.C. at 639
 
 ,
 
 1880 WL 3420
 
 at *1 ;
 
 Gibson,
 

 169 N.C. 318
 
 ,
 
 85 S.E. at 8
 
 . Additionally, shortly after the passage of the statute, our Supreme Court thought it would have applied to a false pretenses case had the timing of the indictment followed the enactment of the statute.
 

 Thus, we now look to the statute to determine whether the indictment in this case, describing the property obtained as "a quantity of U.S. Currency" is sufficient to uphold the indictment. The statute which says describing money simply as "money" is sufficient suggests that term is enough to put a defendant on notice of the property obtained in order to prepare for his or her trial. Here, we have an indictment describing the property as "U.S. Currency," a term more specific than money.
 

 We find it persuasive that an indictment charging defendant with obtaining "beer and cigarettes" by false pretenses is sufficient to put defendant on notice of the charges against him.
 
 State v. Perkins,
 

 181 N.C.App. 209
 
 ,
 
 638 S.E.2d 591
 
 (2007). "Beer and cigarettes" is specific enough to enable a defendant to prepare his defense.
 
 Id.
 
 at 215,
 
 638 S.E.2d at 595-596
 
 . The indictment was upheld despite a lack of value of the beer and cigarettes or a number of cases or packages of those items taken.
 

 In light of N.C. Gen.Stat. § 15-149, we see no reason to treat currency differently than beer or cigarettes. "Money," as the statute explains, is a sufficient description of the property. Here, we have an indictment that goes above that requirement by describing the money as "U.S. Currency." Therefore, we find no fatal defect in the indictment.
 

 V. Conclusion
 

 For the foregoing reasons, we find no error and the final judgment of the trial court is affirmed.
 

 NO ERROR.
 

 Judge DIETZ concurs.
 

 Judge DILLON concurring in part, and dissenting in part.
 

 DILLON, Judge, concurring in part, and dissenting in part.
 

 *755
 
 Defendant argues that the trial court erred in its jury instructions. The majority holds that there was no error on this issue. I concur.
 

 Defendant also argues that the indictment charging him with obtaining "a quantity of U.S. currency" by false pretenses was fatally defective because this description of
 
 the thing he obtained
 
 was not sufficient. The majority holds that the description "a quantity of U.S. currency" does not render the indictment fatally defective. I believe, however, that our Supreme Court's decision in
 
 State v. Reese,
 

 83 N.C. 637
 
 , 640 (1880), which was recently reaffirmed in
 
 State v. Jones,
 

 367 N.C. 299
 
 , 307,
 
 758 S.E.2d 345
 
 , 351 (2014), compels us to agree with Defendant. Accordingly, I respectfully dissent on this issue.
 

 I. Supreme Court Precedents Compel the Conclusion That the Indictment is Fatally Defective
 

 Defendant was indicted for violating N.C. Gen.Stat. § 14-100, which provides that a person is guilty of obtaining property by false pretenses where he obtains "any money, goods, ..., services ..., or other thing of value" by means of a false pretense. N.C. Gen.Stat. § 14-100 (2011).
 

 *646
 
 Our Supreme Court has repeatedly held that an indictment is constitutionally sufficient if it "apprises the defendant of the charge against him with enough certainty to enable him to prepare his defense and to protect him from subsequent prosecution for the same offense."
 
 State v. Snyder,
 

 343 N.C. 61
 
 , 65,
 
 468 S.E.2d 221
 
 , 224 (1996) (citation omitted). For indictments charging under
 
 N.C. Gen. Stat. § 14100
 
 , our Supreme Court has held that "
 
 the thing obtained
 
 [i.e., the money, goods, services, etc.] by the false pretense
 
 must be described with reasonable certainty,
 
 and by the name or term usually employed to describe it."
 
 Jones,
 

 367 N.C. at 307
 
 ,
 
 758 S.E.2d at 351
 
 (emphasis added) (internal marks omitted).
 

 In the present case, "the thing obtained" by Defendant was described in the indictment as "a quantity of U.S. Currency." I believe that decisions from our Supreme Court compel us to conclude that this description is not adequate.
 

 In 1880, our Supreme Court held in
 
 State v. Reese
 
 that a false pretenses indictment describing the property obtained as "money" was fatally defective, stating that "the money obtained should have been
 
 *756
 
 described
 
 at least by the amount-as, for instance, so many dollars and cents.
 
 "
 
 Reese,
 

 83 N.C. at 639
 
 (emphasis added).
 

 In 1941, our Supreme Court reaffirmed this holding in
 
 State v. Smith,
 

 219 N.C. 400
 
 , 401,
 
 14 S.E.2d 36
 
 , 36-37 (1941). In
 
 Smith,
 
 the defendant was accused of obtaining money by false pretenses; and the indictment described the money as "goods and things of value." The Court held that this description was fatally defective, and relying on its 1880
 
 Reese
 
 decision, stated that the money "should have been described [in the indictment]
 
 at least by the amount, as, for instance, so many dollars and cents.
 
 "
 
 Id.
 
 at 401,
 
 14 S.E.2d at 36-37
 
 (emphasis added).
 

 Recently, in 2014, our Supreme Court reaffirmed both the 1880
 
 Reese
 
 decision and the 1941
 
 Smith
 
 decision, stating as follows:
 

 This Court has not had occasion to address this issue recently, but consistently has held that simply describing the property obtained as "money,"
 
 State v. Reese,
 

 83 N.C. 637
 
 , 640 (1880), or "goods and things of value,"
 
 State v. Smith,
 

 219 N.C. 400
 
 , 401,
 
 14 S.E.2d 36
 
 , 36 (1941), is insufficient to allege the crime of obtaining property by false pretenses.
 

 Jones,
 

 367 N.C. at 307
 
 ,
 
 758 S.E.2d at 351
 
 . Following the reasoning in these older cases, the Court held that an indictment alleging that the defendant obtained "services," without some description as to the type of services which were fraudulently obtained, was fatally defective.
 
 Id.
 
 at 307-08,
 
 758 S.E.2d at 351
 
 . The Court so held even though, like in the present case, the indictment was specific in identifying the name of the victim and the date of the offense.
 
 [1]
 

 "U.S. Currency" is almost synonymous with "money," though admittedly, the former language does provide
 
 some
 
 further description, as some
 
 unspecified
 
 amount of dollars and cents issued by our federal government.
 
 See
 

 State v. Gibson,
 

 169 N.C. 318
 
 , 320,
 
 85 S.E. 7
 
 , 9 (1915) (defining "money" as "any lawful currency, whether coin or paper, issued by the Government as a medium of exchange"). However, this description falls short of the specificity which the Supreme Court has repeatedly indicated is
 
 minimally required
 
 in describing money in a false pretenses indictment, namely, that the description "
 
 at least
 
 [state] the amount" of "dollars and cents."
 
 Reese,
 

 83 N.C. at 639
 
 (emphasis added).
 

 *757
 
 I note that our Court has, on occasion, sustained indictments which seemingly conflict with the Supreme Court's decisions. For instance, in 2005 our Court sustained an indictment which described the property obtained merely as "a quantity of U.S. Currency."
 
 State v. Ledwell
 
 ,
 
 171 N.C.App. 314
 
 , 318,
 
 614 S.E.2d 562
 
 , 565 (2005).
 
 [2]
 
 In
 
 Ledwell,
 
 our
 
 *647
 
 Court stated the case was distinguishable from the 1880
 
 Reese
 
 case and the 1941
 
 Smith
 
 case because "the [
 
 Ledwell
 
 ] indictment [mentioned] the specific item," ["a watchband"],"which defendant used to obtain the money," and therefore provided the defendant with "notice of the crime of which he [was] accused."
 

 Id.
 

 However, this reasoning seems flawed as the indictments in the two cited Supreme Court cases
 
 also
 
 mention the items which were used to obtain money. The indictment in the 1880
 
 Reese
 
 case identified the item as "a large and valuable farm with team and stock thereon in the county of Northampton [.]"
 
 Reese,
 

 83 N.C. at 638
 
 . The indictment in the 1941
 
 Smith
 
 case identified the item as "two certain mules."
 
 Smith,
 

 219 N.C. at 401
 
 ,
 
 14 S.E.2d at 36
 
 .
 

 In the 2014
 
 Jones
 
 case-which was decided by our Supreme Court 9 years after
 
 Ledwell
 
 -the indictment, which the Supreme Court held was defective, also identified the item used to obtain property from the victim, namely as "the credit card number belonging to Mary Berry."
 
 See
 
 Record on Appeal at 7,
 
 State v. Jones,
 
 No. COA 12282. In conclusion, I see no meaningful difference between the
 
 Ledwell
 
 indictment (which was sustained) and the indictments from the three Supreme Court cases (which were declared fatally defective).
 

 II. N.C. Gen.Stat. § 15-149 Does Not Overrule Supreme Court Precedent on This Issue
 

 The majority relies, in part, on language in N.C. Gen.Stat. § 15-149 to conclude that the language in the present indictment is sufficient. This statute provides in relevant part as follows:
 

 In every indictment which it is necessary to make any averment as to the larceny of any money, or United States treasury note, or any note of any bank whatsoever, it is sufficient to describe such money, or treasury note, or bank note, simply as money, without specifying any particular coin, or treasury note, or bank note[.]
 

 *758
 
 N.C. Gen.Stat. § 15-149 (2013). The statute, by its terms, only applies to indictments for larceny (and not for obtaining property by false pretenses). However, assuming that the statute applies here, I do not believe that it saves the present indictment.
 

 As noted by the majority, the predecessor of N.C. Gen.Stat. § 15-149 was originally enacted by our General Assembly in 1877 (the "1877 Act") and is referenced in the 1880
 
 Reese
 
 decision.
 
 See
 

 Reese,
 

 83 N.C. at 639
 
 . However, I do not believe that the 1880
 
 Reese
 
 decision stands for the proposition that N.C. Gen.Stat. § 15-149 was intended to relieve the drafter of an indictment for obtaining money by false pretenses from describing the money "at least" by its amount. Rather, I believe that the 1880
 
 Reese
 
 decision stands for the proposition that N.C. Gen.Stat. § 15-149 merely relieved the drafter of the more stringent requirement of that day to
 
 also
 
 "[describe] and [identify] [the exact type of] bank bills, Treasury notes, [etc.]" that were obtained.
 

 Id.
 

 Unlike today, where our paper money consists of "federal reserve notes," paper money in the 1800's was issued in a variety of forms, including "bank notes" issued by various state and federally-chartered banks and "treasury notes" issued by the federal government.
 
 [3]
 
 And prior to the passage of the 1877 Act, drafters of indictments for obtaining money by larceny or by false pretenses were generally required to describe, not only the
 
 amount
 
 of money obtained, but also the
 
 type
 
 of money obtained, e.g. three $10 bank notes or two $5 dollar treasury notes, etc.
 
 See
 

 State v. Fulford,
 

 61 N.C. 563
 
 , 563 (1868) (stating that "[i]t is sufficient to describe [the money] as a bank note for so many dollars on a certain bank, of the value of so many
 
 *648
 
 dollars").
 
 [4]
 
 And as stated by the Supreme Court in the 1880
 
 Reese
 
 decision, a pre-1877 indictment which merely described the thing obtained as "money" without any further description was fatally defective.
 
 Reese,
 

 83 N.C. at 639
 
 .
 
 *759
 
 The Supreme Court in
 
 Reese
 
 noted, though, that the General Assembly had passed the 1877 Act "to remedy the difficulty of
 
 describing and identifying
 
 bank bills, Treasury notes, etc."
 

 Id.
 

 at 639
 
 (emphasis added). However the Court still held to the view that describing the thing merely as " 'money' without anything added to make it more definite, is too loose in indictments of this kind[,]"
 

 id.
 

 at 640
 
 , and that the money should be "described at least by the amount,"
 

 id.
 

 at 639
 
 . The Court reaffirmed this view in the 1941
 
 Smith
 
 decision and more recently in the 2014
 
 Jones
 
 decision.
 

 It is true that N.C. Gen.Stat. § 15-149 contains the language that "it is sufficient to describe such money, or treasury note, or bank note,
 
 simply as money
 
 " which could be construed to relieve a drafter of the requirement of providing
 
 any
 
 further description of the money obtained, including the
 
 amount.
 
 N.C. Gen.Stat. § 15-149 (emphasis added.) However, the language "simply as money" is followed in the statute by the qualifying language, "without specifying any particular coin, or treasury note, or bank note[,]",
 

 id.,
 

 which suggests that the statute is intended only to relieve a drafter of the requirement of describing the
 
 type
 
 of money, e.g., bank notes or treasury notes, which was obtained.
 

 In conclusion, as our Supreme Court reminded us in the 2014
 
 Jones
 
 decision, there is still a requirement to describe the thing obtained in an indictment for false pretenses with "reasonable certainty."
 
 Jones,
 

 367 N.C. at 307
 
 ,
 
 758 S.E.2d at 351
 
 . And where the thing obtained is money, pursuant to N.C. Gen.Stat. § 15-149, it is no longer required that the indictment provide a description of each piece of money in detail (e.g. "three $10 federal reserve notes"). However, based on the 1880
 
 Reese
 
 decision-as reaffirmed in the 1941
 
 Smith
 
 decision and the 2014
 
 Jones
 
 decision-
 
 some
 
 description of the money must be included in the indictment to meet the requirement that it be described with reasonable certainty. Our Supreme Court has articulated the minimal specificity required to be "at least" by its amount (e.g. "$30 in U.S. Currency").
 

 III. Conclusion
 

 The State essentially argues that the indictment in the present case should be sustained because it adequately apprises Defendant of what he was being charged with (e.g., by including the name of the victim and the date of the offense) and that all the elements of the crime were pleaded. However, in an indictment alleging obtaining money by false pretenses, our Supreme Court has repeatedly stated that the money be described "at least by the amount, as for instance so many dollars and cents." Since the Court of Appeals "has no authority to overrule
 
 *760
 
 decisions of our Supreme Court and we have the responsibility to follow those decisions 'until otherwise ordered by our Supreme Court [,]' "
 
 Andrews v. Haygood,
 

 188 N.C.App. 244
 
 , 248,
 
 655 S.E.2d 440
 
 , 443,
 
 aff'd,
 

 362 N.C. 599
 
 ,
 
 669 S.E.2d 310
 
 (2008), my vote is to vacate the judgment convicting Defendant of obtaining property by false pretenses.
 

 [1]
 

 The indictment at issue in
 
 Jones
 
 alleged, in part, that "on or about the 19th day of May, 2010, in Mecklenburg County," the defendant did "obtain services from Tire Kingdom, Inc."
 
 See
 
 Record on Appeal at 7,
 
 State v. Jones,
 

 223 N.C.App. 487
 
 ,
 
 734 S.E.2d 617
 
 (2012).
 

 [2]
 

 Other decisions from our Court are in accord with
 
 Ledwell.
 
 For instance, in 1993, an indictment which identified the thing obtained as "United States money" was sustained.
 
 See
 

 State v. Almond,
 

 112 N.C.App. 137
 
 , 148,
 
 435 S.E.2d 91
 
 , 98 (1993). In an unpublished 2006 opinion, an indictment which identified the thing obtained as "money" was sustained.
 
 See State v. Thompson,
 
 2006 N.C.App. LEXIS 1962, *7.
 

 [3]
 

 The Citizens' State Bank in New Orleans issued a $10 bank note containing the word "DIX" (French for "ten"), which some historians believe is the genesis for the word "Dixie," an historical nickname for the southern region of the United States.
 
 See
 
 "
 
 Dixie
 
 "
 
 Originated From Name
 
 "
 
 Dix
 
 "
 
 An Old Currency,
 
 New Orleans American, May 29, 1916, vol. 2, no. 150, at 3. The word "greenbacks" originally described certain treasury notes with green ink used on one side which were issued by the United States to help fund the Civil War.
 
 See
 

 Lackey v. Miller,
 

 61 N.C. 26
 
 (1866).
 

 [4]
 

 See also
 

 State v. Thomason,
 

 71 N.C. 146
 
 , 146-47 (1874) (holding that language indicating "two five dollar United States Treasury notes" to be sufficient);
 
 State v. Rout,
 

 10 N.C. 618
 
 , 618 (1825) (holding that language indicating "one $20 bank note on the State Bank of North Carolina" was sufficient).